| | |
|---|---|
| PERFORMANCE ABATEMENT SERVICES, INC., )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>GEM TECHNOLOGIES, INC., and )<br>URS CH2M OAK RIDGE, LLC, )<br>)<br>Defendants. | 3:20-CV-00476-DCLC |

**MEMORANDUM OPINION AND ORDER**

Defendant URS/CH2M Oak Ridge, LLC, ("UCOR") has filed a Motion to Dismiss [Doc. 13], alleging (1) that it is entitled to derivative sovereign immunity; (2) Performance Abatement Services' ("PAS") claims are preempted by the government contractor defense, and (3) PAS has failed to plead essential facts to establish UCOR tortuously interfered with Plaintiff's contract with GEM. PAS has responded [Doc. 30]. UCOR has also filed a motion for joinder to GEM's motion to stay pending mediation [Doc. 22] and a Motion to Adopt GEM's motion to stay discovery and/or a protective order [Doc. 45]. The matter is now ripe for resolution.

For the reasons that follow, UCOR's motion to dismiss [Doc. 13] is **DENIED**. UCOR's motion to stay [Doc. 22] is **GRANTED**. UCOR's motion to stay pending the Court resolving UCOR's motion to dismiss [Doc. 45] is **DENIED AS MOOT**.

**I.     BACKGROUND**

The Department of Energy ("DOE") created the Oak Ridge Reservation in 1943 "as part of the World War II Manhattan Project to support the development of the world's first atomic weapon." [Doc. 13-1, pg. 26]. The Reservation contained three sites (1) the Oak Ridge National

1

Laboratory ("ORNL"), which produced and separated plutonium; (2) the Y-12 National Security Complex (Y-12), which enriched uranium; and (3) East Tennessee Technology Park ("ETTP"), which produced highly enriched uranium. *Id.* DOE later used Y-12 to manufacture, store and disassemble nuclear weapon components. *Id.*

Because some of the facilities and land around them had become contaminated with radioactive elements and asbestos as a result of the work done during those early years, in 2010, DOE contracted with Defendant URS/CH2M Oak Ridge, LLC, ("UCOR"), for "the decontamination and demolition and environmental remediation" at the ETTP site and Y-12 facility [Doc. 13-1, pg. 4, § B.1]. This DOE/UCOR contract required UCOR to "provide all personnel, materials, supplies, and services and do all things necessary for, or incident to, providing its best efforts to perform all requirements of this Contract." *Id.* DOE delegated "the responsibility for determining the specific methods and approaches for accomplishing the identified work," *id.*, and authorized UCOR to utilize a "subcontracting approach" for cost containment. *Id.* at pg. 11, § B.8; pg. 23, § B.16. It also required UCOR to follow "all applicable safety and health requirements set forth in 10 CFR 851, *Worker Safety and Health Program*." *Id.* at pg. 173, § H.28(a). Failure to follow the safety and health requirements would subject UCOR to financial penalties and potentially DOE issuing "a stop work order halting all or any part of the work." *Id.* at pg. 173, § H.28(d).

As part of its role as prime contractor, on March 6, 2019, UCOR and Defendant GEM Technologies, Inc. ("GEM"), entered into a subcontract to "perform the hazardous abatement services at the Biology Complex Buildings 9207 and 9210." [Doc. 13-2, pg. 2]. The UCOR/GEM contract placed "the sole responsibility for the performance of the work" on GEM, and permitted UCOR to establish safety programs, which GEM and "all Lower Tier Subcontractors" were

obliged to follow. *Id.* at pg. 7, GC-2, 2.3, 2.7. GEM, and any lower tier subcontractors, had to cooperate with UCOR and DOE and "comply with all applicable safety rules and regulations." *Id.*, GC-4, 4.1; GC-25, 25.1. If GEM failed to perform, the parties agreed UCOR could complete the work itself or if GEM committed a "material violation of any provisions" of the contract, UCOR could terminate the contract. *Id.* at pg. 10, GC-15.1, 16.1. It also authorized UCOR to suspend the performance of any work at any time. *Id.* at pg. 11, GC-18.1. The contract also required GEM, and its lower tier contractors, to "take reasonable precautions in the performance of the work … to protect the environment, safety, and health of employees and members of the public . . . [and be] in compliance with all applicable [UCOR] and DOE environmental, safety and health requirements, orders and procedures including related reporting requirements." *Id.* at pg. 20, GC-55.3. As in the DOE/UCOR contract, the failure to comply with such regulations could result in the issuance of a stop work order. *Id.*, GC-55.4. It also set the minimum requirements for the asbestos abatement as those established by the Occupational Safety and Health Administration ("OSHA) as set forth in 29 CFR 1926.1101. Relevant to this case, this regulation sets forth criteria concerning air monitoring of airborne concentrations of asbestos to which employees may be exposed. *See* 29 CFR 1926.1101(f)(1)(i).

GEM brought in PAS, as a lower tier subcontractor, to assist in the hazardous material abatement. On March 20, 2019, GEM and PAS entered into a subcontract ("GEM/PAS contract") in which PAS agreed to perform asbestos abatement activities for building 9210 and the crawlspace of 9207. [Doc. 13-3, pg. 16]. The GEM/PAS contract incorporated the terms of the UCOR/GEM contract with PAS agreeing to "assume toward [GEM] all the obligations and responsibilities which [GEM] . . . assumes toward [UCOR] . . . . [*Id.*, pg. 4, § 2.1]. Failure to complete the work "in accordance with . . . [the] requirements of the Subcontract . . . [would allow]

3

GEM to . . . terminate all or part of this Subcontract, assume control of the . . . work, take possession of all materials and property necessary to continue performance of the . . . work . . . , re-let the remaining . . . work to others or perform all or any part of the . . . work [itself] . . . ." [*Id.* at pg. 6, § 5.3]. The GEM/PAS also provided a without cause termination that would permit GEM to "terminate this Subcontract when [GEM] determines, in [its] sole discretion and regardless of fault, that such termination is in the best interest of [GEM]. . . . [*Id.* at pg. 7, § 5.7].

The crux of this case focuses on UCOR's issuance of a stop work notice to GEM, which in turn issued one to PAS. The reason UCOR gave for its issuance of such a notice relates to PAS allegedly not properly using personal air monitoring systems consistent with OSHA standards. Some of the PAS employees, rather than using the air monitoring devices to measure the asbestos particulates, placed their monitors in the "hold" position with the device not sampling the surrounding air. PAS claims this was not a surprise to UCOR because in the weeks leading up to July 13, 2020, PAS claims it announced at meetings attended by corporate representatives of both GEM and UCOR that it was intending to place on "hold" their air monitoring systems. Notwithstanding that foreknowledge, on July 16, 2020, UCOR advised PAS that it believed PAS had instructed its employees to change its air monitoring collection practices while working in building 9210. Because UCOR considered this a violation of its Asbestos Work Permit, on July 22, 2020, it issued a stop work order to GEM for PAS's violations [Doc. 13-4, pg. 2]. The next day, GEM, issued a Stop Work Notice to PAS, effective July 22, 2020 [Doc. 1, ¶ 18]. In its stop order notice to PAS, GEM alleged that PAS had violated the terms of the Subcontract [*Id*. at ¶ 20]. PAS adamantly denied it had breached the Subcontract and assigned sinister motives to UCOR's and GEM's concerted action to stop their work, as they complained that it was within one week of completing all the work under the GEM/PAS contract [*Id*. at ¶ 24]. On September 1, 2020, GEM

4

terminated the Subcontract with PAS and withheld payment [*Id*. at ¶ 29, 34]. UCOR completed the balance of the remaining abatement services PAS had agreed to perform.

On November 6, 2020, PAS filed this lawsuit against GEM and UCOR [Doc. 1]. PAS sued GEM for breach of contract, sought a declaratory judgment regarding GEM's termination of the Subcontract, and alleged a violation of the Tennessee's Prompt Payment Act for GEM's failure to pay amounts owed under the Subcontract. PAS's claims against UCOR are tortious interference with the Subcontract under Tenn. Code Ann. § 47-50-109 [*id.* at ¶¶ 50-61]; common law intentional interference with contract [*id.* at ¶¶ 62-73]; intention interference with business relationship [*id.* at ¶¶ 74-82]]; and conversion [*id.* at ¶¶ 83-91]. In its complaint and in contrast to UCOR's and GEM's allegations that PAS had failed to follow the appropriate air monitoring regulations, PAS claims that it had been "at all times during the performance of the Subcontract, in full compliance with applicable safety laws and regulations regarding monitoring employee exposure levels, and PAS disputes that it committed any material safety violation with respect to the air monitoring systems." [Doc. 1, ¶ 16].

UCOR has now filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6) that is pending before the Court. The basis of UCOR's motion centers on its relationship with DOE, a governmental entity ultimately in charge of the remediation project. Based on this relationship, UCOR claims that it has derivative sovereign immunity based on the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680, and *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940).

## II. STANDARD OF REVIEW

UCOR's motion asserts derivative sovereign immunity based on its relationship with DOE and asks this Court to dismiss PAS's complaint under Rule 12(b)(6). Although traditionally

sovereign immunity is a challenge to the Court's jurisdiction under Rule 12(b)(1), "*Yearsley* immunity is ... is an issue to be reviewed on the merits rather than for jurisdiction." *Adkisson v. Jacobs Engineering Group, Inc.*, 790 F.3d 641, 647 (6th Cir. 2015). Thus, the standards for Rule 12(b)(6) apply rather than Rule 12(b)(1).

For a complaint survive a Rule 12(b)(6) motion, it must contain "enough factual matter to raise a 'plausible' inference of wrongdoing." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is one in which "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Should the well-pleaded facts support no "more than the mere possibility of misconduct," dismissal is warranted. *Id*. at 679. Important to the Court's analysis in the context of a Rule 12(b)(6) motion is that the Court "draw[] all reasonable inferences from the allegations in the complaint in favor of the plaintiff. . . ." *Garceau v. City of Flint*, 572 F. App'x. 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 677-79). If even drawing those inferences in plaintiff's favor, the complaint still fails to allege a plausible theory of relief, then it should be dismissed. *Id.*

### III. SCOPE OF DOCUMENTS UNDER CONSIDERATION

The Court begins with deciding what of the filed exhibits it can consider as UCOR's motion relies on documents outside of the Complaint and its attachments. For example, it refers to the DOE/UCOR contract entered in 2010; the GEM/UCOR contract entered in 2019; and the GEM/PAS contract, entered in March 2019 and which was attached to PAS's complaint. While, generally speaking, the Court limits its consideration to the allegations in the Complaint in deciding a Rule 12(b)(6) motion, the Court is not necessarily so constrained. *See Wysocki v. Int'l*

6

*Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). Instead, the Court "'may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein.'" *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016) (quoting *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015)). Considering the three contracts is proper under Rule 12(b)(6). The DOE/UCOR contract is central to PAS's claims and is a matter of public record. It is the contract which enabled UCOR to hire GEM in the first instance. The UCOR/GEM contract is likewise proper since PAS's contract with GEM incorporated the terms of the UCOR/GEM contract [Doc. 13-3, pg. 4, § 2.1]. In it, PAS agreed to "assume toward [GEM] all the obligations and responsibilities which [GEM] . . . assumes toward [UCOR] . . . . [*Id.*]. Considering these additional items does not require the Court to convert UCOR's motion into a motion for summary judgment.

## IV. ANALYSIS

### A. UCOR'S MOTION TO DISMISS UNDER FED.R.CIV.P. 12(b)(6) [Doc. 13].

UCOR argues PAS's claims against it should be dismissed because it enjoys derivative sovereign immunity based on its contract with a federal agency, the Department of Energy. As a sovereign entity, "the United States ... is immune from suit unless it consents to be sued." *Adkisson v. Jacobs Eng'g Group, Inc.*, 790 F.3d 641, 645 (6th Cir. 2015) (citing *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). For some claims, however, Congress has waived its sovereign immunity, others it has not. *See* the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680. One exception has been described as the discretionary-function exception to the waiver of immunity. This means that the United States is not liable for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on

7

the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In *Yearsely*, the Supreme Court held that a contractor engaged in public works "could not be held liable for a Fifth Amendment taking when the contractor was simply an agent acting under its validly conferred authority." 309 U.S. at 21-22. "[I]f [such a contractor's] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the party of the contractor for executing its will." *Yearsley*, 309 U.S. at 20-21. It was thought that *Yearsely* would be confined to only those contractors engaged in public works, but the Supreme Court broadened the scope of *Yearsley* immunity to include any federal contractors, not just those engaged in public works. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 154 (2016), *as revised* (Feb. 9, 2016). "A federal contractor who simply performs as directed by the Government may be shielded from liability for injuries caused by its conduct…. But no "derivative immunity" exists when the contractor has "exceeded [its] authority" or its authority "was not validly conferred." *Id.* Thus, a contractor who "performed as the Government directed" and its authority to do so "was validly conferred" has "no liability [for its conduct] …." *Id.* at 167.

In this case, PAS has not challenged UCOR's argument that DOE "validly conferred" the authority for UCOR to serve as prime contractor at the Oak Ridge sites. *Id.* And although UCOR claims that PAS also does not suggest that UCOR exceeded its authority in issuing the stop work orders as a result of perceived air monitoring violations, PAS claims it was at all times in full

compliance of such safety regulations. In doing so, PAS takes issue with UCOR's factual assertion that by placing the air monitoring devices on hold, PAS was violating the safety regulations.[1]

In addressing a Rule 12(b)(6) motion such as UCOR's, *Adkisson* emphasized the need for district courts to "'construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true.'" *Id*. at 647 (quoting *Laborers' Local 265 Pension Fund v. iShares Trust*, 769 F.3d 399, 403 (6th Cir. 2014)). There is no issue that by the DOE/UCOR contract the federal government has conferred upon UCOR the authority to ensure workplace safety and environmental compliance.

What is at issue is whether UCOR exceeded its authority under the contract. UCOR argues that PAS violated mandatory safety protocols established by OSHA when PAS's employees placed on "hold" some of their air monitoring devices while working in building 9210. But PAS claims that that it was, "at all times during the performance of the Subcontract, in full compliance with applicable safety laws and regulations regarding monitoring employee exposure levels, and PAS disputes that it committed any material safety violation with respect to the air monitoring systems." [Doc. 1, ¶ 16]. PAS's claim of full compliance with OSHA's regulations directly challenges the propriety of UCOR's decision to issue the stop work notice. UCOR claims PAS was violating the safety laws and in response UCOR had to stop them. If that is the case, then UCOR would be operating within the terms of its authority. But PAS disputes that very issue at this stage. Neither

---

[1] PAS also counters that UCOR's conduct in issuing the stop work order and then taking over the balance of the work was in violation of anti-competition laws. But this argument misses the mark. Just because UCOR as the prime contractor has the capacity to provide the same services that PAS can provide – that is hazardous abatement services – does not insulate PAS from termination. To follow PAS's argument to its logical conclusion, a prime contractor who also competes with a subcontractor in the same line of work could always stand accused of violating anti-competitive by terminating a subcontractor and stepping in to finish the job. Neither *Yearsley* nor *Campbell-Ewald* suggest injecting that additional analysis in addressing the immunity issue.

9

party argues that if PAS was "at all times" in compliance with all safety regulations that UCOR would be authorized by the Government to nevertheless issue stop work orders and then step in and take over the project. In other words, assuming PAS was at all times in compliance with all safety protocols, then PAS has an argument that UCOR's stepping in and stopping them would not be consistent with its authority under the DOE/UCOR contract. Because that issue is disputed, UCOR's motion to dismiss [Doc. 13] is **DENIED**.

### B. UCOR's MOTION TO JOIN GEM'S MOTION TO STAY [DOC. 22]

UCOR has filed a motion to join GEM's Motion to stay pending mediation [Doc. 22]. UCOR asks the Court to stay PAS's claims against it if the Court grants GEM's request to stay and if the Court denies UCOR's motion to dismiss. The Court finds this motion [Doc. 22] **WELL-TAKEN** and UCOR's motion to stay PAS's claims against it is **GRANTED**.

In an order contemporaneously filed with this Order, the Court has STAYED the case between GEM and PAS and enforced their alternative dispute agreement by referring the matter to mediation. Because PAS's claims against GEM are similar to its claims against UCOR and certainly involve the same core set of operative facts, the Court finds that the most likely chance this case has to settle is for the Court to refer all parties to mediation at this stage in the proceedings. Accordingly, not only will the PAS/GEM dispute be submitted to mediation, but the Court will also refer the PAS/UCOR dispute to mediation. Mediation shall be completed within 60 days from entry of this Order.

### V. CONCLUSION

For the foregoing reasons, UCOR's Motion to Dismiss [Doc. 13] is **DENIED.** UCOR's Motion to Stay is **GRANTED** [Doc. 22] and UCOR's Motion to join in GEM's motion to stay

pending the Court's resolution of its motion to dismiss [Doc. 45] is **DENIED AS MOOT**. This matter is **REFERRED** to mediation to be completed within 60 days of the date of this order.

SO ORDERED:

               s/Clifton L. Corker
               United States District Judge